1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney

2  HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  MAUREEN C. BESSETTE (CABN 165775)
   Assistant United States Attorney
5
       1301 Clay Street, Suite 340S
6      Oakland, California 94612
       Telephone: (510) 637-3691
7      FAX: (510) 637-3724
       Maureen.bessette@usdoj.gov
8
   Attorneys for United States of America
9

10                          UNITED STATES DISTRICT COURT

11                        NORTHERN DISTRICT OF CALIFORNIA

12                                  OAKLAND DIVISION

13  UNITED STATES OF AMERICA,              )  CASE NO. CR-15-347 JST
                                           )
14          Plaintiff,                     )  **UNITED STATES' OPPOSITION TO**
                                           )  **DEFENDANT'S MOTION FOR REDUCTION**
15      v.                                 )  **AND COMPASSIONATE RELEASE FROM**
                                           )  **CUSTODY**
16  JESSE LEE ZEIGLER,                     )
                                           )
17          Defendant.                     )
                                           )
18                                         )

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 1

ARGUMENT ......................................................................................................................... 4

I.    The Court has no authority to sentence the defendant to home confinement. ............... 4

II.   Court has jurisdiction to modify defendant's sentence but release is not warranted ..... 6

    A.    Applicable Law ................................................................................................ 6

III.  Defendant has not presented an extraordinary and compelling reason warranting release .......................................................................................................................... 10

IV.  Court may not modify defendant's sentence because he is a danger to others. .......... 12

V.   Section 3553(a) factors weigh against release ............................................................ 14

VI.  If the Court modifies defendant's sentence, it should provide restrictive conditions. ... 14

CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

Cases

*Bonneau v. Salazar*, 2020 WL 2216844 (9th Cir. May 7, 2020) ........................................................... 4

*Reeb v. Thomas*, 636 F.3d 1224 (9th Cir. 2011) ................................................................................. 4

*Tapia v. United States*, 564 U.S. 319 (2011) ...................................................................................... 4

*United States v. Arceo*, No. 09-CR-00616-EJD-1, Dkt. 86 (N.D. Cal. May 22, 2020) ........................ 9

*United States v. Ayon-Nunez*, 2020 WL 704785 (E.D. Cal. Feb. 12, 2020) ........................................ 9

*United States v. Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (N.D. Cal. May 4, 2020) ................ 7, 12

*United States v. Cazares*, No. 18-cr-00466-BLF-1, Dkt. 351 (N.D. Cal. Apr. 23, 2020) .................. 12

*United States v. Ceballos*, 671 F.3d 852 (9th Cir. 2011) .................................................................... 4

*United States v. Daychild*, 357 F.3d 1082 (9th Cir. 2004) ............................................................... 13

*United States v. Eberhart*, 2020 WL 1450745 (N.D. Cal. Mar. 25, 2020) ...................................... 7, 9

*United States v. Fobbs,* No. 19-CR-410 WHA, Dkt. 32 (N.D. Cal. Apr. 7, 2020) ........................... 4, 5

*United States v. Furaha*, No. 09-CR-00742-JST-1, Dkt. 36 (N.D. Cal. May 8, 2020) ..................... 14

*United States v. Greenhut*, 2020 WL 509385 (C.D. Cal. Jan. 31, 2020) ............................................ 8

*United States v. House*, No. 14-cr-00196-CRB-1, Dkt. 2202 (N.D. Cal. May 20, 2020) ............... 8, 10

*United States v. Jones*, No. CR 17-070 VC, Dkt. 93 (N.D. Cal. Apr. 10, 2020) ................................. 4

*United States v. Kelley*, 15-cr-00444-CRB-2, Dkt. 146 (N.D. Cal. May 27, 2020) ............................ 8

*United States v. Kim*, No. 17-CR-00355-YGR-1, Dkt. 96 (N.D. Cal. May 1, 2020) .......................... 4

*United States v. Mangarella*, 2020 WL 1291835 (W.D.N.C. Mar. 16, 2020) ................................ 9, 10

*United States v. Raia*, 954 F.3d 594 (3rd Cir. 2020) .......................................................................... 9

*United States v. Reid*, No. 17-cr-00175-CRB-1, Dkt. 554 (N.D. Cal. May 5, 2020) ......................... 7

*United States v. Robinson*, No. 18-CR-00597 RS, Dkt. 33 (N.D. Cal. Apr. 27, 2020) ....................... 7

*United States v. Shabudin*, No. 11-CR-00664-JSW-1, Dkt. 571 (N.D. Cal. May 12, 2020) .............. 8

*United States v. Shayota*, No. 15-CR-00264-LHK-1, Dkt. 780 (N.D. Cal. May 26, 2020) .............. 14

*United States v. Sprague*, 135 F.3d 1301 (9th Cir. 1998) .................................................................. 8

*United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) ................................................................... 13

*United States v. Weidenhamer*, 2019 WL 6050264 (D. Ariz. Nov. 8, 2019) ..................................... 9

| | |
|---|---|
| *United States v. Willingham*, 2019 WL 6733028 (S.D. Ga. Dec. 10, 2019) | 7 |
| *United States v. Zaragoza*, 2008 WL 686825 (N.D. Cal. Mar. 11, 2008) | 13 |

Statutes

| | |
|---|---|
| 18 U.S.C. § 1951(a) | 1 |
| 18 U.S.C. § 3142(g) | 7, 12, 13, 14 |
| 18 U.S.C. § 3142(g)(1)-(4) | 13 |
| 18 U.S.C. § 3553(a) | 6, 12, 14, 15 |
| 18 U.S.C. § 3582(c)(1)(A) | 6, 7, 9, 10, 14 |
| 18 U.S.C. § 3582(c)(1)(A)(i) | 1, 14, 15 |
| 18 U.S.C. § 3621(b) | 4 |
| 18 U.S.C. § 3624(c) | 4, 5 |
| 18 U.S.C. § 3624(c)(2) | 5 |
| 28 U.S.C. § 994(t) | 7, 12 |
| 34 U.S.C. § 60541(g) | 5 |

Rules

| | |
|---|---|
| USSG § 1B1.13 | passim |
| USSG § 1B1.13(2) | 12 |
| USSG § 2B3.1(a) | 1 |
| USSG § 2B3.1(b)(2)(C) | 1 |
| USSG § 2B3.1(b)(3)(A) | 1 |
| USSG § 2B3.1(b)(4)(B) | 1 |
| USSG § 2B3.1(b)(6) | 1 |
| USSG § 3E1.1 | 2 |

## INTRODUCTION

Defendant Zeigler is serving a 120-month sentence at Bureau of Prison ("BOP") Lompoc Federal Correctional Complex (FCC) in California for aiding and abetting Robbery Affecting Interstate Commerce, 18 U.S.C. § 1951(a), with a projected release date of November 29, 2023. *See* http:bop.gov/inmateloc. He seeks release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) or home confinement in light of the COVID-19 pandemic. Having served approximately 61% of his sentence, defendant asserts that he is not a danger, has chronic kidney disease[1] and likely asthma, and, as a 41-year old African American with these conditions has an increased risk of fatality if he contracts COVID-19. Defendant's Motion for Compassionate Release ("Defendant's Motion") at p.3.

The United States opposes defendant's motion because he does not have chronic kidney disease or asthma and has failed to show a medical condition providing extraordinary and compelling circumstances justifying his release. Further, he presents a danger to the community and has only served roughly 61% of his sentence.

## BACKGROUND

On May 27, 2016, defendant pled guilty pursuant to a plea agreement and waived his right to move for relief under Section 3582. PSR ¶ 3. The parties agreed to a base offense level 20, pursuant to USSG § 2B3.1(a); a five level increase for brandishing a firearm, pursuant to USSG § 2B3.1(b)(2)(C); a two level increase for bodily injury to a victim, pursuant to USSG § 2B3.1(b)(3)(A); a two level increase for physically restraining a victim, pursuant to USSG § 2B3.1(b)(4)(B); a one level increase for taking a firearm, pursuant to USSG § 2B3.1(b)(6); and a three level decrease for acceptance of responsibility,

---

[1] Kidney disease can be acute or chronic. *See* www.enkimd.com/is-kidney-disease-reversible.html. ***Acute kidney failure*** is a condition characterized by sudden inability of the kidneys to filter waste products out of the blood, leading to accumulation of waste in the body, disrupting the chemical balance of blood. *Id.* It is most common in patients who are hospitalized for another illness. *Id.* It may be reversed and otherwise healthy patients may recover with normal kidney function. *Id.* ***Chronic kidney disease*** is characterized by partial inability of the kidneys to remove excess water and waste materials from the blood; as fluids and waste accumulate, other body systems are affected. *Id.* High blood pressure and diabetes are the most common causes of chronic kidney disease. *Id.* Chronic and acute kidney disease can be reversed. *Id.* Early diagnosis is important. *Id.* There are five stages of chronic kidney disease--stages 1 and 2 are reversible. *Id.* The CDC lists only chronic kidney disease as increasing risk with Covid. *See* www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.

pursuant to USSG § 3E1.1; for an adjusted offense level of 27. *See* PSR ¶ 4. The parties agreed to a sentence of 120 months imprisonment, three years of supervised release, and restitution to the victims of the robbery. *Id.* at ¶ 4. On October 28, 2016, this Court sentenced defendant to 120 months imprisonment and three years' supervised release. *See* Dkt. #49.

On May 29, 2020, the Warden received defendant's request for home confinement or reduction in sentence. Attachment A (BOP Records) at p.2 and 6-8. On June 3, 2020, the Warden denied the request as it did not provide extraordinary or compelling circumstance which could not have been foreseen by the court at the time of sentencing, and because defendant failed to provide specific information under a qualifying category warranting his request. *Id.* at p.2-3, 9. While defendant asserts that he is not a danger, his underlying convictions and criminal history involve violence and guns. PSR ¶ 6-17, 42-56.

**Home Invasion Robbery.** On March 19, 2015, at 11:13 p.m., law enforcement responded to a report of a home invasion robbery. PSR at ¶ 7. A woman ("Victim") was alone in her home with her two sleeping children when a man wearing a ski mask entered her home and threatened her with a gun and a knife. *Id.* He punched her in the head and restrained her with zip ties. *Id*; U.S. Sentencing Memorandum p.3. The man demanded money and guns, raided the master bedroom, and left her restrained in the bathroom until her child found her. *Id.* at ¶ 8. The man stole a Ruger .40 caliber pistol, a shotgun, a diamond ring from the Victim's finger, $500 in cash, a gold chain, and an Apple iPad. *Id.* at ¶ 9.

**Subsequent Stop of Defendant.** On May 24, 2015, officers stopped a car without a license plate; the driver was on parole, and defendant was a passenger. *Id.* at ¶ 10. Defendant dropped his gun while fleeing and then picked it up. *Id.* at ¶ 11. Officers found defendant hiding in a tree and found a loaded Ruger with eight rounds of ammunition hidden on a school's roof. *Id.* The serial number matched the one stolen from the home in the above robbery. *Id.*

Officers interviewed the driver who let them examine his cell phone. *Id.* at ¶ 13. Less than an hour after the home invasion, defendant texted the driver photos of the Ruger and shotgun stolen during the home invasion. *Id.* Officers searched defendant's home and found the Victim's stolen gold chain, a

folding knife matching that described by the Victim but with a broken blade, and locations within the apartment where the photos of the stolen guns were taken. *Id.* at ¶ 16.

Defendant made incriminating statements to his girlfriend about not wanting that "shit" [the gun] on him and asking her to get rid of the "hats with holes" [referring to ski mask], and told his brother to ensure the gun was destroyed as part of his deal [knowing it could tie him to the home invasion]. *Id.* at ¶ 12.

**Defendant's Criminal History.** Defendant has a history of theft and burglary. *Id.* at ¶¶ 42-56. Between April and May 1995, when he was 16 years old, he and others were charged with committing 9 commercial robberies with a firearm at local Oakland businesses. In 1997, defendant pleaded guilty and was convicted of 4 of those robberies with a firearm. PSR at ¶ 45. Defendant was identified as the robber carrying the firearm in one. These robberies involved threats and violence against the victims. In one of the robberies, victims were tied up and punched. In at least three, victims were hit in the face or head with firearms. In another, a robber threatened, "Don't look or I'll shoot." Defendant was sentenced to 10 years.

At sentencing, defendant reported no history of health issues and no concerns. PSR ¶ 67. He now asserts he has chronic kidney disease and likely asthma.

**BOP Medical Records**. On July 27, 2018, defendant was assessed with "[d]isorder of kidney and ureter, unspecified, N289 – Current," based on a slightly elevated creatinine level. Attachment A, BOP Medical Records at pp.12 and 88 (July 9, 2018 defendant's creatinine level was at 1.28 and his GFR was greater than 60). A Globular Filtration Rate (eGFR or GFR) of less than 60 may suggest chronic kidney disease if found over a 3 month period. *Id.* at p.88. A creatinine level must be taken into account with a person's gender, age, race, and other factors including medication that may impact kidney functioning, like Naproxen. In August 2019, BOP listed this condition as resolved after further tests showed no sign of the condition. *Id.* at pp.68 and 130 (August 2019 GFR 81; September 2018 GFR 81). Further GFR testing confirmed no evidence of kidney disease. *Id.* at p.147 (April 2019 GFR over 60), 183 (March 2020 GFR over 60). In July 2019, defendant refused an annual evaluation for diseases that affect bones, joints and kidneys, nerves, heart, lungs, brain, stomach, etc. *Id.* at p.149.

BOP also tested defendant's creatinine levels, another indicator of possible kidney disease. On July 9, 2018, defendant's creatinine levels were slightly elevated at 1.28; normal range is 0.60-1.20. *Id.* at pp. 88 and 174. In April 2019 the levels were normal. *Id.* p.144 (urine creatinine 193 within range of 60-200) and p.147 (creatinine 1.12 within .60-1.20). In March 2020 defendant's creatinine levels were slightly elevated at 1.29. *Id.* at p.183. A higher creatinine level can be associated with dehydration, diet, and medication such as Naproxin which may impact kidney functioning and which defendant takes (*id.* pp.134, 158, 179).

## ARGUMENT

### I. The Court has no authority to sentence the defendant to home confinement.

Defendant asks the Court to sentence him to home confinement. Defendant's Motion at p.3. Only the BOP, pursuant to its exclusive authority under 18 U.S.C. § 3624(c), can designate where a defendant serves his existing custodial sentence. The Court does not have authority to designate defendant to home confinement and therefore should deny his request.

BOP has exclusive authority to determine the location where an inmate serves his custodial sentence, including whether transfer from a secure facility to home confinement is more appropriate for a particular defendant. *See Tapia v. United States*, 564 U.S. 319, 331 (2011) (when court sentences federal offender, BOP has plenary control, subject to statutory constraints, over place of imprisonment); *United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (BOP has statutory authority to choose location where prisoner serves sentence); *Reeb v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) (Congress delegated to BOP duty to manage and regulate all federal penal and correctional institutions); *see also Bonneau v. Salazar*, 2020 WL 2216844, at *1 (9th Cir. May 7, 2020) (unpublished) (holding home confinement is decision solely within BOP's province).

Although this Court may make a non-binding recommendation to BOP as to home confinement, BOP's designation decision is not reviewable by any court. 18 U.S.C. §§ 3621(b) & 3624(c); *see, e.g.*, *United States v. Kim*, No. 17-CR-00355-YGR-1, Dkt. 96 (N.D. Cal. May 1, 2020) (denying defendant's motion for compassionate release but recommending BOP place defendant in home confinement); *United States v. Jones*, No. CR 17-070 VC, Dkt. 93 (N.D. Cal. Apr. 10, 2020) (same); *United States v.*

*Fobbs*, No. 19-CR-410 WHA, Dkt. 32 (N.D. Cal. Apr. 7, 2020) (recommending BOP place defendant in home confinement).

Before the outbreak of COVID-19, BOP had authority under 34 U.S.C. § 60541(g) to place qualifying inmates over the age of 60 who had served two-thirds of their sentence on home confinement, or assign terminally ill offenders to home confinement at any time. It also had authority 18 U.S.C. § 3624(c) to assign a prisoner to a community correctional facility during the last twelve months of his or her custodial sentence, and to place a prisoner in home confinement for the shorter of 10 percent of his or her term of imprisonment or 6 months.

In light of the global pandemic, BOP received expanded authority to review inmates who are potentially vulnerable to COVID-19 earlier in their sentences for transfer from a secure facility to home confinement. The Attorney General ("AG") directed the BOP to prioritize granting home confinement to eligible inmates who are especially vulnerable to COVID-19 based on their age and underlying health conditions as identified by the Centers for Disease Control and Prevention ("CDC"), where home confinement would be more effective in protecting their health, and not present a great risk to public safety. AG Memo (Mar. 26, 2020). The AG also invoked emergency authority and lengthened the maximum amount of time the BOP Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2)." Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, 134 Stat. 281, § 12003(b)(2) (March 27, 2020).

In response, BOP is broadly evaluating inmates for placement in home confinement according to internal guidelines, with priority given to those most vulnerable to COVID-19 and at facilities most affected by COVID-19. AG Memo (April 3, 2020); *see also* BOP Memo (May 8, 2020) (providing updated guidance allowing BOP to consider home confinement for inmates with minor disciplinary issues within the past 12 months). To date, BOP has increased home confinement by over 161%, transferring 4,600 inmates to home confinement since March 27, 2020. BOP continues to screen all potential inmates for eligibility, without the need for the inmate to apply for consideration. *See* COVID-19 Home Confinement Information, https://www.bop.gov/coronavirus/ (updated every day at 3:00 p.m. EST).

U.S.' OPP. TO DEF.'S MTN FOR RELEASE
CR-15-347 JST                                                    5

Here the BOP denied defendant's request for home confinement because he did not qualify based on a Prisoner Assessment Tool Targeting Estimated Risk and Need ("PATTERN") score of medium and a minor history of violence. *See* Attachment A, BOP Records at p.2-3.

There is great overlap in the considerations between designation for home confinement under Section 3624 and compassionate release under Section 3582(c)(1)(A). Therefore, to the extent defendant asks the Court to modify his sentence pursuant to the Court's authority under Section 3582(c)(1)(A) so that he can be released on probation or supervised release with conditions to stay at home, this Court should abide by BOP's decision.

///

## II. Court has jurisdiction to modify defendant's sentence but release is not warranted

The Court has jurisdiction to consider defendant's motion for compassionate release pursuant to Section 3582(c)(1)(A), as he has submitted a request to the Warden at his prison, and 30 days have lapsed. *See* 18 U.S.C. § 3582(c)(1)(A). However, reduction is not warranted.

Although the COVID-19 pandemic is an extraordinary world event, the BOP denied defendant's request as he has failed to show that that its impact on him, specifically, warrants his immediate release pursuant to Section 3582(c)(1)(A) as there is no evidence he has chronic kidney disease, with a GFR of less than 60 for three months and BOP has rated this resolved. *See* BOP Medical Records at p.68 ("06/06/2019 Resolved – chronic kidney disease, stage 2 (mild)"), p. 81 ("7-11-2018 …a calculated GFR of >60 suggests chronic kidney disease if found over a 3 month period"); p.130 ("GFR 81 … Resolved – chronic kidney disease, stage 2 (mild)"); p.147 (GFR >60); p.149 (7-30-2019 - defendant denied treatment for chronic condition); p.174 (8-6-2019 "GFR 81…Resolved – chronic kidney disease, stage 2 (mild)"); p.183 ("3-26-2020 … GFR .60"). Therefore, there is no evidence defendant is suffering from a medical condition that the CDC has identified as particularly at risk for severe symptoms if he were to contract COVID-19. Further, there is no evidence to support defendant's assertion that he has asthma.

### A. Applicable Law

The Court may only reduce a sentence pursuant to Section 3582(c)(1)(A) if, after considering the factors set forth in Section 3553(a), it finds either "extraordinary and compelling reasons warrant such a

reduction," or the defendant is at least 70 years old and has served at least 30 years in prison, and such reduction is consistent with applicable Sentencing Commission policy statements. *See, e.g.*, *United States v. Reid*, No. 17-cr-00175-CRB-1, Dkt. 554 (N.D. Cal. May 5, 2020) and *United States v. Robinson*, No. 18-CR-00597 RS, Dkt. 33 (N.D. Cal. Apr. 27, 2020).[2]

The pertinent policy statement, United States Sentencing Guidelines (USSG) § 1B1.13, prohibits the Court from reducing defendant's sentence unless the Court determines that he is not a danger to the safety of any other person or to the community. *See* 18 U.S.C. § 3142(g); *United States v. Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (N.D. Cal. May 4, 2020) (denying compassionate release due to danger).[3]

The Sentencing Commission also provided explicit examples of what constitutes "extraordinary and compelling circumstances":

(A) **Medical Condition of the Defendant.**—

    (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii) The defendant is—

        (I) suffering from a serious physical or medical condition,

        (II) suffering from a serious functional or cognitive impairment, or

        (III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

---

[2] Congress explicitly gave authority to the Sentencing Commission to further describe what conduct would authorize a court to order a compassionate release. Specifically, 28 U.S.C. § 994(t) states that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples." The statute also states that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

[3] While district courts disagree about whether the First Step Act alters the binding nature of USSG § 1B1.13, "the limited statutory exceptions to the general rule of finality of judgment" counsels in favor of following the Sentencing Commission's guidance, as one judge of this Court recently did when faced with a similar motion. *Eberhart*, 2020 WL 1450745, at *2; *see also United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (collecting cases).

U.S.' OPP. TO DEF.'S MTN FOR RELEASE
CR-15-347 JST        7

(B) **Age of the Defendant** — The Defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

(C) **Family Circumstances.** —

   (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

   (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

*See* USSG § 1B1.13 cmt. n.1.[4]

Thus, in order to qualify for compassionate release after having exhausted his administrative remedies with the BOP, defendant must be able to demonstrate one of the reasons listed in (A)–(C) above. *See United States v. Kelley*, 15-cr-00444-CRB-2, Dkt. 146 (N.D. Cal. May 27, 2020). Defendant bears the burden to show special circumstances meeting the high bar set by Congress and the Sentencing Commission for compassionate release to be granted. *See United States v. Shabudin*, No. 11-CR-00664-JSW-1, Dkt. 571 (N.D. Cal. May 12, 2020); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that defendant bears the burden of establishing entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998)).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not

---

[4] Application Note 1(D), the final example listed by the Sentencing Commission, is inapplicable to this situation. *See United States v. House*, No. 14-cr-00196-CRB-1, Dkt. 2202 at 4 n.2 (N.D. Cal. May 20, 2020) (holding (D) inapplicable even in light of the COVID-19 pandemic). It provides as follows: "**Other Reasons.** — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." USSG § 1B1.13 cmt. n.1. In turn, BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. In this case, the Director of BOP did not identify any "extraordinary and compelling reason" under this application note.

expected to recover." USSG § 1B1.13 cmt. n.1(A). If defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his motion must be denied.

The existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not by itself fall into either of those categories and therefore could not alone provide a basis for a sentence reduction.[5] As Chief Judge Hamilton recently held, "General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. §1B1.13." *Eberhart*, 2020 WL 1450745, at *2; *see also United States v. Raia*, 954 F.3d 597 (Third Circuit holding that the existence of COVID-19 alone does not constitute a basis for granting compassionate release). The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population.

Nor would a defendant's chronic but manageable underlying medical condition, alone, constitute "extraordinary and compelling" circumstances. *See United States v. Arceo*, No. 09-CR-00616-EJD-1, Dkt. 86 (N.D. Cal. May 22, 2020) (mere fact defendant suffers from chronic conditions is insufficient for compassionate release). Indeed, before the outbreak of COVID-19, district courts addressing § 3582(c)(1)(A) claims routinely noted, "To be faithful to the statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not expected to recover from. Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting compassionate release for defendant suffering from severe back injuries and epilepsy), *quoting United States v. Weidenhamer*, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)). Compassionate release is "rare" and "extraordinary" and courts routinely deny such claims. *See Arceo*, No. 09-CR-00616-EJD-1, Dkt. 86 (noting compassionate release is rare); *United*

---

[5] Indeed, it is reported that some inmates are *trying* to contract COVID-19 in the hopes that it will enable them to get released from prison. *See* https://www.washingtonpost.com/nation/2020/05/12/inmates-coronavirus-infect-los-angeles/ (inmates in LA county jail have attempted to infect themselves with COVID-19 in order to be released).

*States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("compassionate release . . . is an extraordinary and rare event.").

But the combination of an inmate's chronic medical condition and the risk of contracting COVID-19 in a custodial setting may constitute an extraordinary and compelling reason to grant a motion under 18 U.S.C. § 3582(c)(1)(A), where COVID-19 and an inmate's medical condition would not individually suffice. If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[6] that condition—in combination with the likelihood that a defendant may contract COVID-19 while incarcerated and suffer severe symptoms as a result—may constitute a "serious" medical condition "from which [the defendant] is not expected to recover," which "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." USSG § 1B1.13 cmt. n.1(A)(ii)(I). But as part of its analysis of the totality of circumstances, the Court should also consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his institution.

### III. Defendant has not presented an extraordinary and compelling reason warranting release.

Defendant has not demonstrated that he has a medical condition that places him on the CDC list of at-risk individuals who may suffer severe symptoms if they contract COVID-19. While defendant asserts that he has chronic kidney disease and likely asthma, he has neither. *See* Attachment B (Declaration of Dr. Navid Souferzadeh, M.D., BOP at ¶¶ 2, 11. Thus defendant has not met his burden to show a health condition. *See United States v. House*, No. 14-CR-00196-CRB-1, Dkt. 2202 (N.D. Cal. May 20, 2020) (denying compassionate release as defendant did not have CDC-identified risk factor and therefore no extraordinary and compelling reason). Here, defendant is not at a higher risk of severe illness or death from COVID-19 according to CDC guidance and, as a result, he does not meet the listed reasons in USSG § 1B1.13 Application Note 1.

---

[6] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Apr. 2, 2020).

Defendant is serving his sentence at Lompoc FCC, which has 3 active cases of inmates testing positive for COVID-19, 162 inmates recovered, and two COVID-19-related deaths. BOP has taken significant measures to protect the health of inmates in its charge. BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. The Action Plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. There will be exceptions for medical treatment and similar exigencies but this step will limit transmissions of the disease. Likewise, BOP has canceled all official staff travel and most staff training. BOP has also issued all staff and inmates face masks and strongly encouraged them to wear them when in public areas when they cannot practice social distancing.

The Action Plan comprises of several additional preventive and mitigation measures, including suspension of social visitation, internal inmate movements, legal visits, official staff travel, training, access by volunteers and many contractors; extensive screening of staff and inmates (including screening of all new inmates); quarantine; and modified operations to maximize social distancing as much as practicable. *See* Federal Bureau of Prisons, BOP Implementing Modified Operations, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed March 23, 2020). All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures.

As of May 18, 2020, all newly admitted inmates to any BOP detention center, jail, and institution will be tested at a quarantine site for COVID-19, in addition to screening them for COVID-19 symptoms and a temperature check, before they enter their designated BOP facility.[7] The testing will be conducted either using Abbott instruments on-site or through commercial lab contracts. Inmates who test positive or have symptoms consistent with COVID-19 will be placed in isolation, even if asymptomatic, until they meet the current CDC release-from-isolation criteria. COVID-19 negative inmates will be placed in quarantine for 14 days and have twice daily symptom screening and temperature checks. If they develop COVID-19 symptoms during the 14 days, they will be retested for COVID-19 and placed in isolation. At the end of the 14-day quarantine, an inmate will be retested for COVID-19. If the test is negative, the inmate will be deemed appropriate to transfer from the quarantine site to their designated institution. Both inmates and staff are required to wear facemasks during any transfer that occurs. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

### IV. Court may not modify defendant's sentence because he is a danger to others.

Moreover, even if defendant had chronic kidney disease and asthma, he still fails to meet the standard for compassionate release as he presents a danger to the community and the re-balancing of Section 3553(a) factors weigh against him. The Court may not reduce defendant's sentence unless it finds that he is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). *See* USSG § 1B1.13(2); *Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (denying compassionate release due to danger). The record precludes such a finding.

Defendant asserts that he has no infractions in prison and presents no danger. But many defendants do well in prison only to revert to crime upon their release. *See* USSG § 1B1.13 app. note 3 ("Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.") Defendant must also show that he will not be a danger if released. He cannot do so. *See United Sates v. Cazares*, No. 18-cr-00466-BLF-1, Dkt. 351 (N.D. Cal. Apr. 23, 2020) (concluding, in the pre-trial detention context, that the balancing of the factors

---

[7] *See* Federal Bureau of Prisons, BOP Announces Update on Inmate Movement, *available at* https://www.bop.gov/resources/news/pdfs/20200527_press_release_inmate_movement.pdf.

1  does not warrant defendant's release because he continues to pose a serious risk to the safety of the
2  community, and that risk overrides defendant's concerns that he might contract COVID-19 in custody).
3  Recognizing that there is a significant difference between doing well in prison and doing well in society,
4  this Court must look to the factors set forth in 18 U.S.C. § 3142(g).

5  Under § 3142(g), the Court must consider four factors in determining whether defendant might
6  present a danger:

7  (1) the nature and circumstances of the offense charged;

8  (2) the weight of the evidence against the defendant;

9  (3) the history and characteristics of the defendant, including the defendant's character, physical
10 and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse,
11 criminal history, and record concerning appearance at court, and

12 (4) the nature and seriousness of the danger to any person or the community that would be posed
13 by the person's release. 18 U.S.C. § 3142(g)(1)–(4).

14 Consideration of these factors—which are not affected by COVID-19—does not allow this Court
15 to conclude that defendant is not a danger to the safety of any other person or the community. As
16 discussed above, defendant's criminal history and this offense are violent.

17 Further, the COVID-19 pandemic does not reduce the danger defendant poses to others. He or a
18 coconspirator entered a home at night where the Victim was with her sleeping children. The Victim was
19 forced into the bathroom, tied up, punched in the head, had her engagement ring taken off her finger.
20 He has a spate of similar convictions after several armed robberies when he was a young adult. PSR at
21 ¶ 45. The danger posed to the community by firearm offenses has been well-established. *See United*
22 *States v. Daychild*, 357 F.3d 1082, 1100 (9th Cir. 2004) (approving detention on danger prong due to
23 defendant's possession of firearms and stating that "danger posed to the public by armed conspirators
24 who traffic in illicit drugs is too plain to permit dispute."); *see also United States v. Torres*, 911 F.3d
25 1253, 1264 (9th Cir. 2019) (Congress passed Section 922(g) to "disarm groups whose members
26 Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities
27 of citizenship" (internal quotation marks omitted)). [If drug offense, can add: *United States v.*
28 *Zaragoza*, 2008 WL 686825, at *3 (N.D. Cal. Mar. 11, 2008) (Spero, J.) ("In assessing danger, physical

violence is not the only form of danger contemplated by the statute. Danger to the community can be in the form of continued narcotics activity or even encompass pecuniary or economic harm.").

Defendant is a danger to the community and should be detained. California Executive Order N-33-20, available at https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf (issued March 19, 2020). Such rules, though enforced by peace officers, rely largely on voluntary compliance. A person who ignores such admonitions and rules could increase infection rates, leading to severe illness and death. Defendant has shown an unwillingness or inability to follow rules, and a disregard for the welfare of others. His failure to follow rules poses particular dangers to the community. Releasing defendant from his detention, and adding him back into the general population, is antithetical to the concept of sheltering-in-place.

Defendant has not shown a current medical condition or risk of COVID-19 (a risk that applies in the community as well) makes him less of a danger. He presents no additional facts that meaningfully shift the balance of the Section 3142(g) factors to his favor. In sum, defendant has failed to demonstrate that the Section 3142(g) factors the Court previously considered have changed, and thus the Court should deny his motion.

## V. Section 3553(a) factors weigh against release

Finally, any compassionate-release decision—even for a statutorily eligible defendant—must also consider the factors under Section 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Shayota*, No. 15-CR-00264-LHK-1, Dkt. 780 (N.D. Cal. May 26, 2020) (denying compassionate release for defendant who served less than 6% of his custodial sentence based on analysis of Section 3553(a) factors); *United States v. Furaha*, No. 09-CR-00742-JST-1, Dkt. 36 (N.D. Cal. May 8, 2020) (same for defendant who served roughly 20% of his sentence). Defendant has only served -----------% of his sentence, a factor that weighs heavily against his premature, permanent release. The law,and the specific facts of defendant's case weigh against release. Granting defendant's motion under Section 3582(c)(1)(A) would result in a sentence far below the statutory minimum.

Further, defendant has provided no release plan, indicating where he will live and access food or healthcare.

*///*

### VI. If the Court modifies defendant's sentence, it should provide restrictive conditions.

If the Court grants defendant's motion, it should substitute a term of probation or supervised release with a condition of home confinement for the duration of defendant's current sentence of imprisonment, followed by the term of supervised release with conditions as ordered by the Court at defendant's original sentencing hearing. Releasing him outright would not fairly re-balance the Section 3553(a) factors in this case, particularly given that the present conditions caused by the pandemic are likely impermanent—public reporting indicates that various medical professionals globally are in the process of developing a vaccine and researching other methods of combatting the disease in the coming months. *See, e.g.*, https://www.nih.gov/news-events/news-releases/nih-clinical-trial-investigational-vaccine-covid-19-begins.

In order to minimize risks to public health, the government also respectfully requests that the Court order any release only after defendant's release and travel plans are in place, and set any release 14 days from the date of its order to accommodate BOP's ability to quarantine him prior to his release to protect the community from potential further spread.

### CONCLUSION

Defendant has failed to establish extraordinary and compelling reasons to grant his motion, entered into a plea agreement barring him from seeking relief under Section 3582, and is a danger to others. He has not presented evidence of a serious medical condition that substantially impairs his ability to provide self-care or any other extraordinary or compelling reason to warrant a reduced sentence. This Court should therefore deny defendant's motion for immediate release under Section 3582(c)(1)(A)(i).

DATED: September 11, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____/s/_____
MAUREEN C. BESSETTE
Assistant United States Attorney

U.S.' OPP. TO DEF.'S MTN FOR RELEASE
CR-15-347 JST                           15